IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TRAVELERS PROPERTY CASUALTY      )
COMPANY OF AMERICA,              )
                                 )
            Plaintiff,           )
                                 )
    v.                           )   Case No. 06-0946-CV-W-REL
                                 )
NATIONAL UNION INSURANCE         )
COMPANY OF PITTSBURGH, PA, and   )
KANSAS CITY POWER & LIGHT,       )
                                 )
            Defendants.          )

## ORDER GRANTING MOTION TO STRIKE EXPERT TESTIMONY OF MICHAEL L. GREGORIUS, JR.

Before the court is a motion by defendant Kansas City Power & Light ("KCP&L") to strike the expert report and testimony of Michael Gregorius, Jr., on the grounds that he is not qualified to render an opinion on entitlement to recovery of monies through subrogation efforts, he offers opinions that constitute impermissible legal opinions, and his opinions are not sufficiently reliable to assist the trier of fact. I find that although Mr. Gregorius is almost certainly an expert in other areas of insurance, his experience has not established that he is an expert in the areas of insurance involved in this case. Therefore, the motion to strike his expert testimony will be granted.

## I.    BACKGROUND

National Union Insurance Company of Pittsburgh, Pennsylvania, and Reliance Insurance Company issued primary

insurance policies to Kansas City Power & Light with limits of $200 million. Travelers issued an excess insurance policy to KCP&L to provide coverage in excess of the $200 million, if the primary layer of coverage was exhausted. An explosion occurred at KCP&L's generating station. National Union made payments to KCP&L. Subsequently, National Union and KCP&L entered into an allocation agreement to apportion any recovery proceeds. Travelers filed this suit to recover proceeds of subrogation claims obtained by National Union and KCP&L.

On February 8, 2008, KCP&L filed the instant motion to strike the expert testimony of Michael Gregorius, Jr. (document number 123). Defendant National Union joined in this motion (see documents 127 and 128). On February 19, 2008, Travelers filed a response to the motion to strike, arguing that Mr. Gregorius's opinions are based on his extensive experience in the insurance industry (document number 132). On March 5, 2008, KCP&L filed a reply, pointing out that its objection to Mr. Gregorius's testimony is based on his lack of experience with subrogation and the fact that he has not demonstrated that he has any specialized understanding of recovery of subrogation proceeds (document number 148).

On April 11, 2008, I held a hearing on defendant's motion. Plaintiff was represented by Robert Cockerham. Defendant National Union was represented by Malcolm Reilly. Defendant

2

KCP&L was represented by Brian O'Bleness and Robin Carlson. Michael Gregorius, Jr., testified. I judicially noticed the deposition of Mr. Gregorius, found in the record as Exhibit C to document number 119, the suggestions in support of the motion to strike the expert testimony of Allan Windt, and Mr. Gregorius's expert report, found in the record as Exhibit B to document number 119, the suggestions in support of the motion to strike the expert testimony of Allan Windt. Subsequent to the hearing, plaintiff's counsel provided all of the documents that were relied upon by Mr. Gregorius in forming his opinions, the list of which is attached to this order as Exhibit 1.

## II. FINDINGS OF FACT

Based on the evidence presented at the hearing, I make the following findings of fact:

1. Michael Gregorius, Jr., is an insurance broker (Tr.[1] at 11). In June 1966, Gregorius graduated from St. Louis University with a degree in Commerce and accepted a job with Aetna Casualty & Surety Company for a brief time before being drafted (Tr. at 12-13; D.[2] at 9). After serving two years in the military, Gregorius returned to Aetna (Tr. at 13; D. at 10).

---

[1]"Tr." refers to the transcript of the Daubert hearing.

[2]"D." refers to the transcript of Mr. Gregorius's deposition.

3

2.  During the two months in 1966 and resuming in 1968, Mr. Gregorius trained for 14 months as an underwriter (Tr. at 13; D. at 9).  Mr. Gregorius's training included understanding the construction of insurance policies relative to what was intended to be covered and excluded, terms and conditions of insurance policies, how the policy was expected to operate in terms of the relationship between the insurance company and the insured, disciplines of rating and determining premiums, loss control, and safety engineering (Tr. at 14-15).  During his training, he learned the standard principles of subrogation (Tr. at 15).

3.  Once Mr. Gregorius finished 14 months of underwriter training, he transferred to the marketing department (Tr. at 16; D. at 10).  In that department, he worked directly with brokers and the brokers' clients to establish insurance programs, design coverage for insurance programs, rate insurance programs, and develop ways to individualize coverage for a particular risk (Tr. at 16, 17).

4.  Part of the training in the underwriting area and in the marketing area included how re-insurance affected the insurance product being presented and how it affected the insured, if at all (Tr. at 17).

5.  Mr. Gregorius works with fire insurance on personal and real property, business interruption insurance, and marine exposures which involve mobile property such as cargo and

4

contractors' equipment (Tr. at 18-19). He works with builder's
risk policies which cover construction projects (Tr. at 20).
While working at Aetna, Mr. Gregorius needed an understanding of
how these different policies worked so he could discuss the needs
of the brokers or the insureds (Tr. at 21).

6.  In 1976 Mr. Gregorius left Aetna because of
organizational changes affecting the marketing department, and he
wanted to stay involved in the "marketing, the selling and
servicing of insurance." (Tr. at 28; D. at 10, 12).  Mr.
Gregorius received his brokers license and joined R.B. Jones (Tr.
at 23; D. at 12-13).  He worked directly with insurance
purchasers to arrange insurance coverage through insurance
companies (Tr. at 23).  In his job as a broker, he explained to
the insured the terms and conditions of the policy, which
included subrogation (Tr. at 23-24).

7.  In 1980, Alexander & Alexander purchased R.B. Jones (Tr.
at 28; D. at 14).  Mr. Gregorius stayed with that firm until 1983
(Tr. at 28; D. at 14).  At that time he started MLG Corporation,
a brokerage firm, and brokers through Welsh Flatness & Lutz, an
arrangement that continues to exist (Tr. at 28; D. at 14, 16).
While at R.B. Jones, Alexander & Alexander, and Welsh Flatness,
Mr. Gregorius was a broker (Tr. at 28).

8.  Mr. Gregorius has put together hundreds of layered
insurance policies (Tr. at 76).  Out of those, none have involved

5

him in subrogation claims or negotiations for an allocation agreement, which is an agreement among the parties as to how the proceeds would be recovered and shared by the parties (Tr. at 76-77, 84). He has never initiated any action involving third parties (Tr. at 87).

9. Mr. Gregorius testified that his understanding of subrogation is that it is "top to bottom", with the excess carrier being entitled to receive the proceeds of subrogation prior to the primary carrier being reimbursed, and then if there is anything left after both of the insurance companies recover, the insured gets those excess proceeds (Tr. at 22). "The basis for that is it's a standard in the industry." (Tr. at 24). "If the . . . excess carrier was not entitled to a priority of those subrogation rights, the cost of the excess insurance would escalate significantly and/or excess insurance wouldn't be available. So, the standard of the industry that subrogation worked from top to down is an important factor in the structure of all insurance programs for numerous clients where there [are] primary and excess layers of insurance available." (Tr. at 27).

10. Mr. Gregorius has worked with Travelers, Hartford, CNA, Liberty Mutual, Acuity, AIG, National Union, Lexington Insurance Company and others; and he has had the same understanding of how these policies work since 1976 (Tr. at 29).

11.   Welsh Flatness & Lutz has its own claims department,
its own loss control department, its own surety bond department,
and various specialized underwriting units (Tr. at 31, 73).  Some
insurance companies will write preferred contract agreements with
brokers meaning the broker will perform some of these other
functions in exchange for additional premiums (Tr. at 31-32).
Mr. Gregorius does not work in the claims department or the loss
control department (Tr. at 73).  He does not become involved when
there is a loss, but he is aware of it from conversations with
the people who are involved (Tr. at 84-85).  If one of his
clients was not happy with how a claim was handled, the client
would come to Mr. Gregorius and he would go to the claims
department to find out what was going on (Tr. at 85).  This has
happened a few times in the last ten years (Tr. at 86-87).  He
does have, about three or four times per year, clients come to
him as it relates to subrogation (Tr. at 85).  Most, if not all,
of the subrogation Mr. Gregorius has been involved in this way
involves building new property where the parties wave subrogation
rights against one another so there is only a need to buy one
policy that covers everyone, unlike this case where there is a
completed structure (Tr. at 86-87).

12.   Mr. Gregorius is involved in general liability;
automobile liability for truckers, contractors, and material
dealers; umbrella policies; excess insurance; professional

7

liability; errors and omissions; officer and director liability; employment practices liability; worker's compensation; and garage-keepers legal liability (bailee insurance) (Tr. at 33-34). When Mr. Gregorius sells insurance, he meets with his client to make sure the client understands the risks that are insured and what coverages the client wants (Tr. at 34). He then selects an insurance company and negotiates the terms of an insurance contract (Tr. at 34-35). Once the insurance coverage has been obtained, Mr. Gregorius stays in touch with the client to make sure additional or different coverage is provided if business changes requiring different coverage (Tr. at 35).

13. If there is a subrogation provision, Mr. Gregorius explains to the client what subrogation means in terms of the insurance policy and "what it means in terms of the standard practice in the insurance business." (Tr. at 37-38). Mr. Gregorius referred again to the industry's top-down theory of subrogation and stated that he got that from "different texts and different books" (Tr. at 38). When asked to name the books, treatises, or other resources that he has looked at, Mr. Gregorius stated as follows:

> Well, the most important one that I rely on or I think the industry as a whole relies on, there is a gentleman named Couch -- Professor Couch. In Professor Couch's position -- I don't have the exact quote -- but he says that when insurance is provided in the form of layers, that the primary -- or the excess carrier is entitled to reimbursement through the subrogation process ahead of the primary carrier. And he goes on further to state that the

8

> theory is that the subrogation, the damages that are
> recovered, the dollars that are recovered through
> subrogation should be looked at as reducing the loss.  And
> if the loss is reduced the excess carrier would not be
> involved in the claim in the first place.

(Tr. at 38-39).

14.  Mr. Gregorius testified that he was aware of this practice when he worked at Aetna in the mid 1960's, and "it's still the same practice in the industry today." (Tr. at 39). When asked if he has ever seen it work any other way, Mr. Gregorius testified that he has never seen where a primary insurance carrier collects the proceeds of subrogation before an excess carrier (Tr. at 39).  His opinion is based on "40 years of experience watching it happen that way." (Tr. at 40).

15.  Mr. Gregorius has never been involved in a subrogation action (Tr. at 41, 75, 84).  He has never designed one or set one up; he has never collected any money (Tr. at 42).  Over the past 40 years, Mr. Gregorius has serviced about 200 to 250 clients (Tr. at 43-44).  Less than 1% to 2% of those involved excess insurance coverage (or less than two to five) (Tr. at 89).  Of those, none have ever gone to court under a factual situation similar to the one in this case (Tr. at 89).  All have been resolved amicably among the parties, and Mr. Gregorius assumes that due to the client's expectations (based on what Mr. Gregorius told the client), the issue would have been resolved with the top-down distribution (Tr. at 90).

9

16.  Mr. Gregorius has never testified as an expert before (Tr. at 46).  He does not have much involvement in the claims aspect of insurance cases (Tr. at 46).  He has never participated in any subrogation activity (Tr. at 46, 75, 84).  He explains to his clients how he expects the policies to work, but those "can be changed in the legal process." (Tr. at 47).  Mr. Gregorius does not deal with claims handlers (Tr. at 47).  He stated that he was never involved in subrogation because it was a claims function (Tr. at 69-71; D. at 19-20, 40, 43).  He also stated that he has never been involved with adjusting a claim and has never worked on the claims side of the insurance business (Tr. at 71, 84; D. at 40, 43).  Subrogation has not been a part of his job responsibilities (Tr. at 71-72, 84).

17.  Mr. Gregorius testified that if an insured was paid its insurance money for a loss and then recovered money[3] from the wrongdoer, it would have double payment if the insured did not turn that recovery over to the insurance company (Tr. at 53).  "He would be being paid twice for a loss." (Tr. at 54).  "[T]he principle of the insurance policy, and these types of policies is not to provide an enhancement to the insured, but to [put] the

---

[3]Mr. Cockerham asked "if an insured was paid its insurance money for a claim, for a loss, and then it went and recovered **insurance** money for the loss. . ."  It appears from the answer that Mr. Cockerham meant to ask what would happen if the insured recovered money from the entity at fault, not more insurance money.  Mr. Gregorius referred to a recovery from a "third party" (Tr. at 54).

insured back in a position he was in before the loss occurred."
(Tr. at 54).

18.  Mr. Gregorius was asked how the following would work:
An insured obtains $2 million in insurance, $1 million from the
primary carrier and another million from the excess carrier.  He
then claims a $3 million loss, obtains the $2 million in
insurance proceeds and recovers $1 million from the tortfeasor
(Tr. at 55).  Mr. Gregorius testified that the $1 million
recovered from the tortfeasor should go to the excess carrier and
the insured would have to incur that loss representing the
uninsured damages (Tr. at 55-56).  Mr. Gregorius's opinion is
based on the 34 items he reviewed (the list of which is attached
to this order as Exhibit 1), his background, his experience, his
specialized knowledge and training, and "all those years of
working with these exact issues" (Tr. at 56-57).  Mr. Gregorius
was asked to give an example of a case he was involved in which
paralleled the previous example (Tr. at 57).  He testified that
he "set the claim up" where a building was having asbestos and
lead pain removed (Tr. at 57).  During the process, a fire was
started by a contractor and the building burned (Tr. at 57).
"[T]he subrogation recovery against the abatement contractor was
. . . top to bottom.  The excess carrier was reimbursed first and
then the primary carrier was partially reimbursed, because the
loss -- it wasn't a total loss.  So, but the excess -- the full

11

excess limit was used in the claim. That excess carrier was reimbursed and then the primary carrier got what was left." (Tr. at 58). However, when asked what his role was in this action, he said, "None" (Tr. at 77). The insured was a client of his firm and he "heard about" the activities and what had happened "through the normal course of being in the office." (Tr. at 77). He had no personal involvement in that action, and he does not recall the names of the insurers because this was seven or eight years ago (Tr. at 77-78). He is aware that after the insurance company made payment for the damages, the insurance company instituted the action for subrogation (Tr. at 87). He is not aware if the insurance company obtained rights for subrogation from the insured, "I don't know how that particular process worked." (Tr. at 87). He does not know whether the recovery going to the excess carrier in full and to the primary carrier in part was pursuant to any kind of agreement between the insurance carriers (Tr. at 88). He does not know whether the insurance policy in that case was similar to the one in this case, and he testified that the language in the policy would override any general industry standard (Tr. at 110-111). He testified that he knows of no other instances of top-down recovery in which there were similar subrogation provisions as in the excess policies in this case (Tr. at 112).

12

19.  There were other instances involving not his clients, but clients of his firm (Tr. at 58).  Mr. Gregorius has never heard of a reimbursement not going to the excess carrier (Tr. at 58-59).  He is aware of some instances where the recovered monies went to the excess carrier, but he was unable to say when those occurred or give any other information about those cases (Tr. at 78).  Although Mr. Gregorius was not involved in any of these actions, he was "directly involved with learning what ha[d] occurred" (Tr. at 83).

20.  Mr. Gregorius has never heard of an instance where a loss in excess of the primary and secondary insurance was recovered from the wrongdoer by the insured in litigation (Tr. at 89).  He was asked the following hypothetical:  A principal insurer insures for $200 million, an excess insurer insures $100 million up to a total of $300 million, and an incident results in $300 million actual loss (Tr. at 90).  Under those circumstances, Mr. Gregorius testified that there would be no motivation on the part of the insured to bring a third-party action against the wrongdoer, rather the insured would agree to cooperate with the insurance companies who would pursue litigation against the tortfeasor (Tr. at 90-91).  This is normally written into insurance policies (Tr. at 91).  If the insured has recovered all of its damages through insurance proceeds, to hire lawyers and

13

pursue an action against the tortfeasor would be "throwing money out the window." (Tr. at 92).

21. The next hypothetical involved a $400 million loss with $300 million of insurance coverage (Tr. at 93-94). Mr. Gregorius was asked, "[I]s there something in the practice that says that during that -- during that recovery that one or the other of these insurance companies is principally responsible for bringing those actions, taking the risk, and going forward with them and those types of things?" (Tr. at 95). Mr. Gregorius responded,

> A. I don't know that there is a -- again, I don't get involved in that end of it.
>
> Q. Okay.
>
> A. I don't know whether there is [sic] procedures or practices as to dictate either the primary or the excess carrier to take the lead.
>
> Q. Okay. And I just want to stay with what you know. I don't want you to go beyond what you know.
>
> A. No. I don't know that. But although I will say that I believe that, and I haven't seen this, I haven't participated in it, but I believe there would normally be an understanding between the insurance companies as to whom they were going to have representing them and --
>
> Q. They would get together and they work out probably some sort of a side deal?
>
> A. I would assume that, yes.
>
> Q. Okay.
>
> A. But I have never been a party to that. I have never participated in any of that.

(Tr. at 95-96).

22.  The next hypothetical involved a $400 million loss with $300 million in insurance coverage with the insured attempting through litigation to collect the $100 million uninsured loss from the wrongdoer (Tr. at 100).  Mr. Gregorius said, "I would think the party that had a hundred million dollars worth of loss that wasn't insured would still have a third-party action or a pretty reasonable opportunity to collect the hundred million from whoever the negligent party was.  So, to the extent that he's going to recoup a hundred million dollars of uninsured loss, he does have an incentive to hire the lawyers, to move forward, to file his own action." (Tr. at 100).  Mr. Gregorius stated that the insurance companies would sue for their $300 million payout, but that the insured would need to sue for its uninsured damages (Tr. at 101).  I asked, "[I]f the insured just, the insured is sitting there.  He's got a hundred million dollars in additional losses and the insurance companies have not recovered a dime. There is -- in my mind there is no motivation on the part of the insured to hire lawyers and incur expenses." (Tr. at 102-103). Mr. Gregorius said, "I agree with you."

23.  The next question was, "[I]f the insured goes out there and the insurance company does nothing, is there some practice here or policy about that?" (Tr. at 103).  Mr. Gregorius responded, "Well, I don't know about a practice or policy. . . . I don't know of any -- no.  I don't know.  I don't know of any."

15

(Tr. at 103).

24. When asked whether an insurance company has to make a payment before it gets involved in subrogation, Mr. Gregorius said, "[M]y position is unless the insurance company makes a payment, they have no subrogation right." (Tr. at 104). He was then asked, "But to preserve that subrogation right if the insured knows there's a potential that an excess carrier may get on a hook, only the insured can preserve that right or the excess company, right?" (Tr. at 105). Mr. Gregorius responded, "That's more of a legal question than what I know." (Tr. at 105).

25. Mr. Gregorius has not published anything on insurance standards or subrogation (Tr. at 64-65). Mr. Gregorius has not taught any classes on insurance standards or subrogation (Tr. at 65). He has never given any lectures on insurance standards or subrogation, although he has frequently given lectures on other insurance topics (Tr. at 65). Mr. Gregorius did not mention any treatises or industry publications in his Rule 26(a) report (Tr. at 66). Mr. Gregorius referred in his testimony to the Couch treatise provided by plaintiff's counsel, but he does not know who the current author was (Tr. at 67-68). He referred to 16 Couch on Insurance 61:48 at 133 (2nd edition), 1983 (Tr. at 79). He has not read the third edition, though he admitted it may be important to his expert opinion depending on what it says (Tr. at 81). Mr. Gregorius is not aware of any written materials that

16

support his understanding of the principle of indemnity (Tr. at 68-69). His opinion on the industry standard with respect to subrogation is not based on any written materials (Tr. at 69).

26. Mr. Gregorius has never testified in federal or state court as an expert (Tr. at 73-74; D. at 47-56). Although his report lists four cases under the heading "Expert Testimony Given by Michael Gregorius", that was a mislisting or a misunder- standing (Tr. at 74; D. at 47-56). Mr. Gregorius was a fact witness in those four proceedings (D. at 47-56).

## II. ADMISSIBILITY OF EXPERT TESTIMONY

When expert testimony is offered, the trial judge serves as "gatekeeper" to ensure that it meets the requirements of Federal Rule of Evidence 702[4] including determining admissibility with respect to a motion for summary judgment. General Electric Co. v. Joiner, 522 U.S. 136 (1997). The party offering opinion testimony must prove the witness is qualified to testify and that the testimony is admissible by a preponderance of evidence. Bourjaily v. United States, 483 U.S. 171, 175-176 (1987). The trial judge has wide discretion in determining whether to admit

---

[4]F.R.E. 702: If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

17

or exclude the testimony.  <u>General Electric Co. v. Joiner</u>, 522 U.S. at 142-143.

Before allowing an expert to testify, the trial judge must make a preliminary assessment of whether a proffered expert's methodology is both scientifically valid and applicable to the case.  <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579, 592-93 (1993).  This "gatekeeping requirement" is to ensure that the proffered expert witness exercises the same "intellectual rigor" in the courtroom as does an expert in the relevant field.  <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 152 (1999).

Under Rule 702, an expert's knowledge, skill, experience, training, or education must be sufficient to assist the trier of fact; and the area of the witness's competence must match the subject matter of the witness's testimony.  <u>Robinson v GEICO Gen. Ins. Co.</u>, 447 F.3d 1096, 1101 (8th Cir. 1006).  "[T]here are many different kinds of experts, and many different kinds of expertise."  <u>Kumho Tire</u>, 526 U.S. at 150.  The fact that a proposed witness is an expert in one area, does not *ipso facto* qualify him to testify as an expert in all related areas.  <u>Shreve v. Sears, Roebuck, & Co.</u>, 166 F. Supp. 2d 378, 391 (D. Md. 2001); <u>Oglesby v. General Motors Corp.</u>, 190 F.3d 244, 247 (4th Cir. 1999); <u>Wilson v. Woods</u>, 163 F.3d 935, 938 (5th Cir. 1999); <u>Ancho v. Pentek Corp.</u>, 157 F.3d 512, 517 (7th Cir. 1998); <u>Bogosian v. Mercedes-Benz of North America</u>, 104 F.3d 472, 476 (1st Cir.

18

1997); Trumps v. Toastmaster, Inc., 969 F. Supp. 247, 252 (S.D.N.Y. 1997); Silva v. American Airlines, Inc., 960 F. Supp. 528, 531 (D.P.R. 1997); Diviero v. Uniroyal Goodrich Tire Co., 919 F. Supp. 1353, 1356-57 (D. Ariz. 1996), aff'd, 114 F.3d 851 (9th Cir. 1997).

The gatekeeping function, like other determinations of admissibility of evidence, requires the trial judge to exercise an informed and broad discretion. Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199-200 (4th Cir. 2001); Oglesby v. General Motors Corp., 190 F.3d 244, 250 (4th Cir. 1999). Two aspects of this determination are pertinent to the case at hand: Whether the expert is qualified; and if so, whether the opinion he proffers is reliable. See Kumho Tire, 526 U.S. at 150.

"Where all of the facts upon which a determination is based can be placed before the trier of fact and proper deduction of the determination therefrom does not require special training to adequately understand the significance of the facts, the determination thus made is a 'conclusion' within the meaning of the rules of evidence and, as such, is not admissible." Coca-Cola Co. v. Joseph C. Worthman Drug Co., 48 F.2d 743, 746 (8th Cir. 1931).

In Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc., 389 F. Supp. 2d 1145, 1154 (D. Alaska 2005), the court disqualified as an expert on marine pollution insurance

19

policies a man who had nearly 50 years experience in the insurance industry:

> Despite many years of experience in the insurance business, with respect to underwriting marine pollution policies Wilton's experience is minimal, sporadic, and concerning stand-alone policies of the type at issue in the case at bar non-existent. His opinion as to current industry standards is based on experience in underwriting at a time when pollution insurance did not stand-alone but were part of protection and indemnity policies, and even that experience is not of recent vintage. Finally, Wilton has no knowledge of the underwriting policies, practices, or procedures of either Lloyds or WQIS, the dominant issuers of marine pollution policies. In sum, Wilton lacks "particularized experience with vessel pollution policies" and, therefore, although qualified to testify as an expert on some aspects of the standards of the insurance industry, he is not qualified to testify as an expert on underwriting marine pollution insurance policies.

In this case, I find that although Mr. Gregorius likely may be an expert in many areas of insurance, subrogation is not one of them.

1.  His college degree is in Commerce.

2.  His training is in underwriting, marketing, and brokering.

3.  His work experience has been in selling insurance and working as an insurance broker.

4.  Although he has put together hundreds of layered insurance policies, none have involved him in subrogation claims or negotiations for an allocation agreement.

5.  He has never initiated any action involving third parties.

Case 4:06-cv-00946-REL   Document 188   Filed 05/14/08   Page 20 of 25

6.   He does not work in the claims department or in the loss control department.  He has never adjusted a claim.  He has not worked in the area of subrogation because that is a claims function.

7.   He does not become involved when there is a loss. Instead he becomes "aware" of it from "conversations with the people who are involved."

8.   Most if not all of the subrogation he has been involved in through discussions with his clients has involved building new property; none have involved a case like the present one with a completed structure.

9.   His opinion regarding the top-down theory of distribution came from "different texts and books"; however, the only one named was the Couch treatise.  He did not mention any treatises or industry publications in his Rule 26(a) report.  He did not know the name of the current author of the Couch treatise he referred to.  He does not know whether he referred to the current edition.  He referred to 16 Couch on Insurance 61:48 at 133 (2nd edition); however, when asked to produce that, plaintiff's counsel produced a printed page of Highlands Insurance Co. v. New England Ins. Co., 811 S.W.2d 276 (Tx. Ct. App. 1991), which quotes 16 Couch on Insurance § 61:48 at 133 (2d ed. 1983):  "Where the insurers' coverage is in the nature of layers, the excess carrier should recover under subrogation

21

before primary insurers can be reimbursed. One can look at a subrogation recovery as reducing the net loss, in which case the excess carriers would not be obligated to pay the loss." See D. Ex. 1. Because (i) there was no mention of the Couch treatise in his Rule 26(a) report, (ii) the Couch treatise is not included among the 34 materials reviewed by Mr. Gregorius, (iii) he testified that he "read some Couch material before I met with Mr. Cockerham" (Tr. at 78), and (iv) the only Couch material submitted was these two sentences quoted above by a Texas State court, it appears that Mr. Gregorius did not rely on the Couch Treatise in formulating his opinion.

10. He testified that his opinion is based on 40 years of experience watching it happen that way. However, all of this has come from hearing things in the office, not from specific knowledge of the facts of each case.

11. Less than 1 to 2 percent of his clients involve excess insurance coverage (less than two to five). Of those, none have ever gone to court under a factual situation similar to the one in this case. All have been resolved amicably and he "assumes" the issue would have been resolved in accordance with his own theory of distribution. He has no knowledge of the specific outcome of any of these distributions.

12. He stated that his opinion was based on the 34 items he reviewed[5], his background, his experience, his specialized knowledge and training, and all his years of "working with these exact issues." However, he was not able to give any example of working with these issues. He gave one example of a subrogation case but said he had no role in it, he merely "heard about" what happened just by being present in his office. He was unable to say whether the insurance company obtained rights for subrogation from the insured ("I don't know how that particular process worked"), he did not know whether the recovery to each insurance carrier was pursuant to any type of agreement between the carriers, he did not know whether the insurance policy in that case was similar to the policy in this case (and he testified that the language of the policy would override general industry standard).

13. He is not aware of any other instances of top-down recovery in which there were similar subrogation provisions as in this case.

14. He is aware of some instances where the recovered money went to the excess carrier, but he had no specific information about those cases, he had merely heard what had occurred.

---

[5]None of which include anything outside the pleadings, contracts, agreements, and court orders entered in this litigation, i.e., there are no documents which generally discuss the industry standard.

15. He has never heard of an instance where a loss in excess of insurance coverage was recovered from the wrongdoer by the insured in litigation.

16. He does not know if there is any practice or policy regarding which insurance company is primarily responsible for bringing an action against the wrongdoer.

17. He does not know if there is any practice or policy governing the money collected from the wrongdoer by an insured when the insurance company does not attempt to collect from the wrongdoer.

18. He has never published anything on insurance standards or subrogation.

19. He has not taught any classes on insurance standards or subrogation.

20. He has never given any lectures on insurance standards or subrogation.

While the fit between an expert's specialized knowledge and experience and the issues before the court need not be exact, Wheeler v. John Deere Co., 935 F.2d 1090, 1101 (10th Cir. 1991) (lack of perfect fit will go to the weight not the admissibility of expert testimony), an expert's opinion is helpful to the trier of fact, and therefore relevant under Rule 702, "only to the extent the expert draws on some special skill, knowledge or experience to formulate that opinion". Shreve v. Sears, Roebuck,

24

& Co. 166 F. Supp. 2d at 393. Again, although Mr. Gregorius is almost certainly an expert in other areas of insurance, his experience has not established that he is an expert on the areas of insurance involved in this case. His education is not in this area, his training is not in this area, he has not worked in this area, he is unaware of any cases that are significantly similar to this one, his knowledge of similar cases is based on things he has heard through the office rather than his own knowledge, and he has no specific knowledge of agreements or policy language which would affect the outcome of the cases he has heard about.

## III. CONCLUSION

Based on all of the above, I find that Michael Gregorius, Jr., does not qualify as an expert in the areas to which he has rendered an opinion in this case. Therefore, it is

ORDERED that the motion to strike his expert testimony is granted.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
May 14, 2008

25