IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

TRAVELERS PROPERTY CASUALTY          )
COMPANY OF AMERICA,                  )
                                     )
            Plaintiff,               )
                                     )
      v.                             )   Case No. 06-0946-CV-W-REL
                                     )
KANSAS CITY POWER & LIGHT,           )
                                     )
            Defendant.               )

**ORDER GRANTING**
**KANSAS CITY POWER & LIGHT'S MOTION FOR SUMMARY JUDGMENT**

Before the court is defendant Kansas City Power & Light's
motion for summary judgment on the grounds that (1) funds
recovered by KCP&L represent uninsured losses, (2) Travelers is
estopped from asserting that KCP&L's recoveries were for insured
losses, (3) the insurance contract does not require KCP&L to
reimburse Travelers funds recovered for uninsured loss, (4) KCP&L
is entitled to the funds at issue pursuant to the made-whole
doctrine, (5) Travelers seeks to exercise reimbursement rights
which have been waived, and (6) Travelers abandoned its rights to
subrogation through its own conduct and refusal to act.  I find
that under Missouri law, Kansas City Power & Light is entitled to
recover and to keep proceeds representing uninsured damages, and
that Kansas City Power & Light has not been compensated for any
insured damages as it has recovered less than its uninsured
damages.  Therefore, defendant's motion for summary judgment will
be granted.

*I.    BACKGROUND*

On February 17, 1999, an explosion occurred at KCP&L's Hawthorn Generating Station.  On April 3, 2001, KCP&L filed a lawsuit in state court (01cv207987).  Prior to trial, KCP&L and National Union settled with various third parties for a total of $126,592,696.12.  On March 4, 2004, a jury awarded KCP&L and National Union $97,622,191.16[1].

Meanwhile, on June 14, 2002, KCP&L filed suit against National Union and Travelers in Jackson County Circuit Court alleging that National Union had not paid all that it was obligated to pay under the primary insurance contract and that Travelers had paid nothing pursuant to the secondary insurance contract that was in effect at the time of the explosion. National Union had provided $200 million in primary insurance coverage and Travelers had provided $100 million in excess coverage.

On July 19, 2002, the defendants removed that case to federal district court and the case was assigned to District

---

[1]On March 4, 2004, the jury found damages in the amount of $452,000,000.  They assessed KCP&L 70% liable and Rockwell Automation, the only defendant left who had not settled, 30% liable.  On May 26, 2004, the trial judge determined that a contractual limitation applied and reduced the verdict to $190,867.00.  The court of appeals reinstated the jury verdict on May 9, 2006; and, after apportioning the percentage of liability and giving credit for settlements, KCP&L's final judgment was $97,622,191.16.  <u>KCP&L v. Bibb</u>, 197 S.W.3d 147 (Mo. Ct. App. 2006).

Judge Dean Whipple (case number 02-0680-CV-W-DW) (hereinafter referred to as "the first federal case"). On July 1, 2004, National Union was dismissed from that lawsuit pursuant to a settlement agreement with KCP&L. On September 10, 2004, Judge Whipple entered an order finding that $56 million[2] recovered by KCP&L from third parties represented "uninsured loss" and therefore could not be used to calculate "ultimate net loss". Under the excess policy, Travelers's $100 million liability did not kick in until KCP&L had suffered greater than $200 million in "ultimate net loss." On February 1, 2005, Travelers and KCP&L filed a stipulation of dismissal with prejudice in accordance with a settlement agreement under which Travelers paid KCP&L $10 million. On February 8, 2005, Judge Whipple dismissed that case.

On November 18, 2005, Travelers filed the instant action in federal court in the Eastern District of Missouri. The case was transferred to the Western District of Missouri on November 17, 2006, and assigned to me. In its amended complaint, Travelers seeks a declaratory judgment against KCP&L finding that Travelers is entitled to $10 million of KCP&L's portion of the $97,622,191.16 awarded by a jury against Rockwell Automation in state court in 2004. This motion for summary judgment was filed on February 29, 2008 (document number 142).

---

[2]This refers to KCP&L's portion of the settlements in the amount of $126,592,696.12 received in the state court action by both KCP&L and National Union.

Case 4:06-cv-00946-REL   Document 200   Filed 07/24/08   Page 3 of 48

On April 2, 2008, Travelers filed its response in opposition to KCP&L's motion for summary judgment (document number 165), arguing that (1) under Missouri law KCP&L held the proceeds for Travelers who retained the right to recover once a tortfeasor had been held responsible; (2) the <u>Bibb</u> lawsuit sought all losses arising out of the explosion -- insured and uninsured -- and Missouri law makes no distinction between recoveries for uninsured versus insured damages; (3) the court's previous rulings were only relevant to the interpretation of the excess policy's ultimate net loss clause, not to subrogation, and therefore, estoppel does not apply; (4) there is no "made-whole" doctrine recognized under Missouri law; (5) any made-whole doctrine would be superseded by the express terms of the subrogation clause in the excess policy; (6) the Settlement Agreement includes Travelers's reservation of its right to reimbursement of the $10 million; and (7) Travelers had no duty to be involved in the attempt to recover from the wrongdoers until its layer of coverage was triggered. On April 17, 2008, KCP&L filed a reply (document number 179), distinguishing the cases cited by Travelers in its response.

## II. STANDARD FOR SUMMARY JUDGMENT

Rule 56(c), Federal Rules of Civil Procedure, permits summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

The key to determining whether summary judgment is proper is ascertaining whether there exists a genuine issue of material fact. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. <u>American Academy of Family Physicians v. United States</u>, 75 A.F.T.R.2d 95-1709 (W.D. Mo. 1995), <u>aff'd</u> 91 F.3d 1155 (8th Cir. 1996). The party moving for summary judgment has the burden of proving that these requirements for summary judgment have been met. <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157 (1970).

In a summary judgment analysis, a court must first consider whether there are any issues of fact. If the only issues are issues of law, then summary judgment is appropriate. <u>Disesa v. St. Louis Community College</u>, 79 F.3d 92, 94 (8th Cir. 1996). If issues of fact are raised, a court must consider whether these issues are material to the outcome of the case. Materiality is identified by the substantive law that is to be applied. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. at 248. Factual

5

disputes that are collateral to the substantive law will not preclude summary judgment.  Id.

In addition to the requirement that a dispute of fact be material, the dispute must also be genuine.  A dispute of fact is considered genuine if the non-moving party has produced sufficient evidence such that a reasonable jury could return a verdict for that party.  Id. at 249.  When considering a motion for summary judgment, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor.  Id. at 255.  If the evidence submitted by the non-moving party is merely colorable or is not significantly probative, then summary judgment may be granted.  Id. at 249-250.

Where the party moving for summary judgment does not bear the burden of proof at trial, that party must show "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  This burden is met when the moving party identifies portions of the record demonstrating an absence of a genuine issue of material fact. Id. at 323.  If the moving party meets the requirement, the burden shifts to the non-moving party who must set forth specific facts showing that there is a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 474 U.S. at 248.  The trial judge then determines whether a trial is needed -- "whether, in other words, there are any genuine factual issues that properly can be

6

resolved only by a finder of fact because they may reasonably be resolved in favor of either party." _Id_. at 250.

### III. _PROPOSED UNCONTROVERTED FACTS_

#### A. _UNCONTROVERTED FACTS OFFERED BY DEFENDANT_

Below, typed in bold, are the facts offered by defendant which I find to be uncontroverted by the record before me. Any uncontroverted facts without citations to the record are not controverted by the plaintiff in its response. Any proposed facts not in bold remain controverted.

**1. On February 17, 1999, a natural gas explosion occurred at KCP&L's Hawthorn Generating Station, Kansas City, Missouri.**

**2. As a result of the explosion, KCP&L suffered damages totaling $452 million.**

Travelers admits that a jury determined that the damages totaled $452 million, but then goes on to "admit" and "deny" things that are not in the proposed fact. Those statements are irrelevant.

**3. Travelers was aware that KCP&L was claiming a significant uninsured loss[3].**

---

[3]In support of this proposed fact, KCP&L cites to the deposition testimony of Bill Schoeneborn, John Condon, and Karen McCormack. However, the deposition transcripts do not indicate who Mr. Condon is or for whom he works; and although her transcript indicates that Ms. McCormack works for Farmers, she did not indicate in the deposition pages I have been provided exactly what her position with the company is. Because Travelers did not object on this basis, I will assume that Mr. Condon and

7

Travelers admits that KCP&L submitted proofs of loss to the insurers claiming total insured losses of $285,870,731.00. This is not responsive to the proposed undisputed fact. KCP&L cites to the deposition testimony of Bill Schoenborn, Executive General Adjuster for Travelers, who testified that he was aware KCP&L was claiming to have a "significant" uninsured loss and knew KCP&L had claimed over $400 million in total damages. Because KCP&L has cited to evidence which supports this proposed fact, and because Travelers has failed to respond appropriately, this fact will be deemed undisputed.

**4. Between March 17, 1999, and December 30, 1999, Roe Vaughn, the Executive General Adjuster on the loss advised all insurers in nine separate reports that "there is a strong possibility that the quantum of loss may breach the next layer of $200,000,000.00." Travelers received copies of the reports authored by Vaughn[4].**

_____

Ms. McCormack hold positions with Travelers and that their positions would provide them with relevant information.

[4]Federal Rule of Civil Procedure 56(e) requires that evidence presented "set forth such facts as would be admissible in evidence". Plaintiff has failed to include an affidavit from Vaughn which would make this exhibit admissible pursuant to Rule 56. This is a recurring problem throughout all of plaintiff's and defendant's exhibits. However, because neither party objected to the inadmissibility of the documents, I will assume there is no objection to their authenticity. In addition, KCP&L's exhibit 6 is a 52-page document. Travelers includes exhibit 21 which is literally hundreds of pages long, and cites to that exhibit without indicating what pages of the exhibit are

Case 4:06-cv-00946-REL   Document 200   Filed 07/24/08   Page 8 of 48

Travelers admits that the first nine reports prepared by Roe Vaughn contain the quoted language. Travelers then goes on to "admit" and to "deny" things which do not appear in the proposed fact. Those statements are irrelevant.

**5. KCP&L has not been fully compensated for the insured and uninsured losses it suffered from the explosion -- it has received less than $452 million in insurance, settlement, and judgment proceeds.**

Travelers denies this proposed fact and cites a state court judgment which found that KCP&L was found to be 70% at fault for the damages and "cannot be 'fully compensated' for the damages it caused." This is a legal argument and does not respond to the proposed fact finding the total amount of damages sustained, regardless of fault.

**6. Defendant National Union issued a primary insurance policy, Policy No. ST 260 44 57, policy period 03/31/1997 through 03/31/2000, to KCP&L.**

**7. Pursuant to the primary policy, Reliance insured $25 million of the first $100 million in damages, while National**

_____

relevant to the specific proposed fact or objection. Searching through documents of this size when there has been no direction provided as to what pages are relevant makes ruling a summary judgment motion take many times longer than simply holding a trial. Therefore, unless specific pages are cited, I will not search through voluminous documents to see if they support a proposed fact or objection.

Union insured $75 million of the first $100 million worth of damages and $100 million of the second $100 million of the primary layer of insurance.

8.   Thus the primary policy, which National Union and Reliance issued to KCP&L, had limits of $200 million.

9.   The Subrogation Condition of National Union's primary policy provides:

> If in the event of loss or damage, the Insured shall acquire any right of action against any individual, firm or corporation for loss of, or damage to, property covered hereunder, the Insured will, if requested by the Company, assign and transfer such claim or right of action to the Company or, at the company's option, execute and deliver to the Company the customary form of loan receipt upon receiving an advance of funds in respect of the loss or damage, and will subrogate the company to, or will hold in trust for the Company all such rights of action to the extent of the amount paid or advanced, and will permit suit to be brought in the Insured's name under the direction of and at the expense of the Company.

10.   The Subrogation provision of the primary policy declarations provides in part:

> If the company pays a claim under this policy, it will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities[.]  The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

11.   Travelers issued an excess policy, Policy No. KTXJ-CMB201T279-9-98, policy period 03/31/1998 through 03/31/1999, to KCP&L.  The excess policy provides that Travelers "insures

10

**against risks of direct physical loss or damage to Buildings, Structures and Personal Property."**

**12. Under the excess policy issued to KCP&L, Travelers was liable for loss in excess of the $200 million insured by National Union and Reliance through the primary policy, with limits of $100 million.**

In support of this proposed fact, KCP&L cites to the excess property policy issued on April 10, 1998. This is a 15-page document; however, KCP&L has not directed me to any particular portion of the document. Travelers contests this proposed fact; however, the only difference I can find between KCP&L's version and Travelers's version is the inclusion of "and Reliance" in KCP&L's version. But even more remarkable is the fact that although Travelers disputes this fact as offered by KCP&L, it offers the very same proposed fact in its own "additional" undisputed facts. See Travelers's proposed undisputed fact number 7, "The Travelers Excess Policy had limits of $100 million in excess of the $200 million insured by National Union and Reliance."

**13. The excess policy's subrogation provision states:**

**SUBROGATION - This insurance shall not be invalidated should the Insured waive by specific written agreement prior to a loss any or all right of recovery against any party for loss insured against by the policy. Each Insured agrees to assist and cooperate with The Travelers in any subrogation proceedings which it initiates and to do nothing after a loss to prejudice The Travelers subrogation rights. The**

Travelers may require from the Insured an assignment of all right of recovery against any party for loss to the extent that payment therefore is made by Travelers. The Travelers shall be entitled to priority of recovery against any such third party (including interest) to the extent payment has been made to the Insured, plus attorney's fees, expenses for costs incurred by the Travelers.

14. In a letter dated September 27, 1999, Gary Morrow, Risk Manager for KCP&L, told representatives of National Union, Reliance, and Travelers that "KCP&L has an independent right of recovery against possibly the same set of potential responsible parties, to the extent that we have a loss that is uncompensated under the insurance contracts."

15. Morrow invited the insurers, including Travelers, to meet to discuss jointly pursuing claims against third parties. Morrow stated that KCP&L wanted to establish an agreement with each insurer to determine how costs and recoveries would be apportioned.

16. On November 5, 1999, Roe Vaughn faxed a communication to representatives of the insurers, including Bill Schoenborn of Travelers, confirming that a subrogation meeting had been scheduled for November 15, 1999, and noting that a discussion between the insurers and KCP&L regarding the allocation of subrogation recovery funds and expenses was expected at the meeting.

17.  On November 11, 1999, Schoenborn sent an e-mail to Charles P. Nicholas and John P. Condon, both at Travelers, in which he discussed the KCP&L loss and stated that "the possibility certainly exists that it will reach $200M." Schoenborn advised the recipients of the e-mail of the November 15, 1999, subrogation meeting and stated that "[i]t is also expected that the carriers and KCP&L will be discussing sharing of any recoveries.  The potential for recovery does exist according to Roe Vaughn."  Schoenborn further stated that "attendance by a subrogation representative would be in our best interests."

18.  Travelers was aware of the meeting held on November 15, 1999, but no representative from Travelers attended.

Travelers denies this proposed fact by arguing that Travelers had no right to attend the meeting as it had not made payment to KCP&L.  This is not responsive to the proposed fact.

19.  KCP&L proposed that National Union, Reliance, KCP&L, and Travelers enter into an Allocation Agreement to cooperate in the prosecution of claims and/or actions against third parties responsible for the explosion.

In support of this proposed fact, KCP&L cites to the deposition testimony of Gary Morrow, KCP&L's Risk Management Consultant, wherein he said that National Union and KCP&L entered

13

into an agreement to pursue claims, that Travelers was given the opportunity to participate in the agreement and was encouraged to participate in the agreement, but Travelers declined. KCP&L also cites to the deposition testimony of Bill Schoenborn, Executive General Adjustor for Travelers, wherein he said that Travelers declined to participate in the subrogation.

Travelers disputes this fact, arguing that by the time Travelers was invited to participate in the allocation agreement, KCP&L, National Union, and Reliance had already entered into the agreement. In support of this position, Travelers cites to a letter written by Mr. Schoenborn to Mr. Morrow declining to participate in the agreement on the ground that Travelers did not believe the damages would exceed the $200 million primary coverage. This exhibits does not support Travelers's position on this proposed fact, nor does it call into question the fact as proposed by KCP&L.

**20.  KCP&L further suggested that pursuant to a proposed agreement, National Union, Reliance, Travelers, and KCP&L would share the costs associated with recovery from responsible third parties, and then allocate the recovery among National Union, Reliance, Travelers, and KCP&L.**

Travelers disputes this proposed fact, arguing that there was no proposed agreement sent to Travelers. The proposed fact does not say a proposed agreement was sent to Travelers. Because

14

Travelers does not address the proposed fact, this proposed fact will be deemed admitted.

21. National Union and KCP&L entered into the allocation agreement dated June 29, 2000.

22. On September 19, 2000, Gary Morrow (KCP&L's risk management consultant) met with Bill Schoenborn (executive general adjuster for Travelers) and proposed that Travelers join in a subrogation agreement with KCP&L and the primary insurers.

23. As a follow-up to the September 19, 2000, meeting between Bill Schoenborn and Garry Morrow, Bill Schoenborn drafted a letter to Gary Morrow dated September 20, 2000, reiterating that Travelers was not going to participate in the recovery efforts from responsible third parties because it did not expect KCP&L's insured damages to exceed the $200 million primary policy limits.

24. However, in a September 21, 2000, e-mail from Bill Schoenborn to his superiors at Travelers, Schoenborn stated that he had reached an agreement with the carriers and Vaughn that "it would not be appropriate for Travelers to participate in the subrogation agreement, as it might send an incorrect message that [Travelers] expects the loss to exceed $200M."

25. In a letter dated October 13, 2000, Bill Schoenborn informed KCP&L that Travelers "declines to participate in the

subrogation agreement at this time."  Schoenborn further stated,

"Based on the present status of the loss adjustment, Travelers

does not anticipate making payments which would give risk to a

subrogation interest in this matter.  For this reason, we do not

believe it is appropriate for us to participate in the

subrogation agreement at this time."

26.    The allocation agreement provided:

WHEREAS, on February 17, 1999, an explosion occurred at
KCPL's Hawthorn Unit 5 ("Hawthorn") which resulted in loss
and damage (hereinafter "Loss" or "Losses") to KCPL;

WHEREAS, a portion of the Loss was covered under the
Policies;

WHEREAS, a portion of the Loss was not covered under
the Policies;

WHEREAS, the Insurers claim to be subrogated to the
rights of KCPL against any third party who may have caused
the Loss, to the extent of their payments;

WHEREAS, KCPL claims the right to pursue recovery of
those Losses;

WHEREAS, the Insurers and KCPL agree that it would be
in their mutual best interests to cooperate in the
prosecution of any claim and/or action against any third
parties ("Target Defendants") that they believe to be
responsible for the Loss ("Recovery Action"); and

WHEREAS, the Insurers and KCPL have reached an
agreement regarding the management of the Recovery Action,
the sharing of costs associated with the Recovery Action and
the allocation of any recovery therefrom.

Travelers admits that the cited language is in the

allocation agreement but denies "each and every remaining

16

allegation."  I do not see any other allegation in this proposed fact.

27.  The allocation agreement contemplated the recovery of both insured and uninsured losses KCP&L suffered from the Hawthorn generating station explosion.

28.  Travelers admits the typical reason behind an allocation agreement is to allocate between the insured loss and the uninsured loss.

29.  Travelers has previously made a minimal payment to an insured to protect its subrogation right, knowing that it could not file suit against wrongdoers without first having made a payment.

30.  In 2001 KCP&L, acting in concert with National Union, filed suit against numerous third parties responsible for the Hawthorn generating station explosion in Jackson County, Missouri, styled Kansas City Power & Light Company v. Bibb & Associates, Inc., et al., No. 01CV207987 (the "Bibb" case). Prior to the trial, KCP&L received $126,592,696.12 in settlement proceeds from several responsible third parties.

31.  Pursuant to the allocation agreement, National Union received 55% (approximately $70 million) of the settlement proceeds, while KCP&L received 45% (approximately $56 million) of the settlement proceeds.

17

32.  At the conclusion of the Bibb trial, the jury found that KCP&L sustained $452 million in total damages.

33.  On May 26, 2004, the trial court entered a judgment against defendant Rockwell ("Rockwell judgment") in the amount of $97,622,191.16.

34.  The Honorable Judge Williamson reduced the judgment to $190,000.00.  On September 5, 2006, in accordance with a Mandate issued by the Missouri Court of Appeals for the Western District, Judge Williamson reinstated the judgment in the amount of $97,022,191.16.

35.  Pursuant to the allocation agreement, National Union received 55% (approximately $53.3 million) of the Rockwell judgment proceeds, while KCP&L received 45% (approximately $43.7 million) of the judgment proceeds, plus interest.

36.  KCP&L and National Union bore all the litigation risks, including attorneys' fees and expenses incurred, in bringing claims against third parties responsible for the Hawthorn generating station explosion.

37.  By June 2004 Travelers recognized that it had lost any subrogation right that it had.

In support of this proposed fact, KCP&L cites the deposition of Karen McCormack (employed in some unknown position with Travelers) saying that her initial reaction was that Travelers's

18

subrogation rights were gone.  KCP&L also cites to a claim file, but neglects to point to any specific page of the claim file in support of this proposed fact.

In disputing this proposed fact, Travelers cites to the deposition of Kerry McCormack (which I assume either refers to Karen McCormack or is an error) saying that it was her understanding that Travelers could proceed with subrogation.

In its reply, KCP&L points to the specific page of the claim file wherein Ms. McCormack indicates Travelers has hired a lawyer and opines that Travelers's subrogation rights are gone because the insured would raise the issue of prejudice due to the insured going after the money itself.

Because Ms. McCormack made what appear to be conflicting statements, or her own analysis on the potential outcome of any subrogation wavered, this fact remains in dispute.

**38.  In April 2002 while the <u>Bibb</u> case was pending, Travelers met with counsel for KCP&L and National Union during which the case against the tortfeasors was presented in detail to Travelers.  Travelers took the position that it was "not involved and [did] not see a lik[e]lihood that they will be."  Travelers was impressed with the investigation and evaluation of the case and believed there would be a recovery.**

**39.  Travelers recommended that it continue to reinforce "excess carrier first right of recovery at least as between**

19

primary and excess." Travelers's recommendations do not include any statement regarding first right of recovery with respect to KCP&L.

40. Following the Hawthorn generating station explosion, on June 13, 2002, KCP&L made a claim to National Union and Reliance under the primary policy for $200 million and under the excess policy to Travelers for $85,870,731.00.

41. KCP&L initiated a lawsuit against National Union and Travelers in the United States District Court for the Western District of Missouri, case no. 02-0680-CV-W-DW, to recover proceeds pursuant to the primary and excess policies.

42. In May 2004 National Union and KCP&L reached a settlement agreement in which National Union agreed to pay $30,809,967 to resolve the claims, thereby exhausting the $200 million primary policy limits of liability.

43. On July 29, 2004, the court ordered the parties to brief the following issues:

     a. Whether KCP&L or Travelers was entitled to declare that monies already received by KCP&L represent its uninsured loss or insured loss.

     b. Whether the court or a jury should determine how much of the monies already received by KCP&L represent its uninsured loss or insured loss.

20

44. On August 12, 2004, Travelers filed a brief in response to the July 29, 2004, order.

45. On August 26, 2004, KCP&L filed a response brief pursuant to the July 29, 2004, order. In an affidavit attached to the brief, Bob Gingrich, then corporate counsel for KCP&L, stated that "KCPL's intent in executing the Allocation Agreement with National Union Fire Insurance Company and Reliance National Insurance Company was to recover its uninsured losses in the recovery action." In the affidavit, Mr. Gingrich recited trial testimony of KCP&L's expert witness, Karl A. McDermott, in which Mr. McDermott testified that KCP&L's loss of use damages (i.e., uninsured loss), which included fuel costs of $34 million, replacement power costs of $116 million, lost sales profits of $26 million, and an operating & maintenance savings of $29 million, totaled $147 million.

46. On September 7, 2004, Travelers filed a reply brief pursuant to the July 29, 2004, order.

47. On September 10, 2004, the court issued an order in which it held that "KCPL is entitled to allocate the amount that it has recovered from third parties as insured or uninsured loss." The court further concluded:

> The Allocation Agreement entered into by KCPL and National Union contemplates a recovery of both the insured and uninsured losses suffered by the plaintiffs. Travelers

21

Brief at Ex. D (Allocation Agreement).  Because the suit
prosecuted by KCPL and National Union was intended to
recover both insured and uninsured losses, it is reasonable
to surmise that the amount recovered by National Union --
the primary insurer -- represents the insured loss, while
the amount recovered by KCPL is attributable to its
uninsured loss.  See also KCPL Brief at Ex. 1 (Affidavit of
Bob Gingrich) ("KCPL's intent in executing the Allocation
Agreement . . . was to recover its uninsured losses in the
recovery action.)  In any event, given the case law on the
subject, it is KCPL's prerogative to declare how much of the
monies it has recovered from third parties should be
allocated to its uninsured loss. It has done so in this
case.

In its response, Travelers admits this fact and then
"further admits" things that are not in the proposed fact.  That
portion of the response is not relevant.

48.  In January 2005 Travelers and KCP&L reached a
settlement agreement in which Travelers agreed to pay $10 million
to resolve KCP&L's excess policy insurance claim.

49.  In the settlement agreement with KCP&L, Travelers
expressly acknowledges that "any alleged subrogation right as
regards KCPL with respect to recoveries from third parties
previously obtained by KCPL is released."

50.  In the settlement agreement, Travelers attempts to
reserve a subrogation right to any future recoveries by KCP&L
from third parties, and KCP&L disputes that Travelers has a right
of subrogation with respect to future recoveries.  Travelers
releases and discharges all other claims or demands of any nature

22

**whatsoever now arising or which may hereafter arise with respect to the insurance claim.**

Travelers essentially admits all of the above, but points to another paragraph of the agreement wherein it reserved a subrogation right applicable to any future recoveries by KCP&L from third parties. This statement is irrelevant in that the money being sought in this lawsuit is not a "future recovery". It was awarded to KCP&L by a jury the year before this settlement agreement was reached.

**51. On July 21, 2006, Travelers filed its first amended complaint in this matter, adding KCP&L as a defendant. Travelers asserted one claim against KCP&L (count 4) seeking a declaratory judgment on the following issues:**

> **(1) Travelers has a superior interest in any monies recovered through subrogation, and no party is entitled to reimbursement of subrogation monies prior to Travelers; (2) Travelers is entitled to reimbursement of the $10 million it paid to KCPL from amounts KCPL recovers from Rockwell Automation, Inc., plus interest; (3) to award Travelers its expenses, costs, and attorney's fees incurred; and (4) and [sic] for such other and further relief as this Honorable Court deems just and appropriate.**

## B.  *UNCONTROVERTED FACTS OFFERED BY PLAINTIFF*

Below, typed in bold, are the facts offered by Travelers in its response which I find to be uncontroverted by the record before me. Any uncontroverted facts without citations to the record are not controverted by KCP&L in its reply. Any proposed facts not in bold remain controverted. Many of Travelers's

23

proposed undisputed facts are the same facts offered by KCP&L in

its motion.  I fail to see why Travelers repeated all of these

facts, and I decline to address them a second time.

1.    This is a duplicate of fact number 6 above.

**2.    The National Union policy states in relevant part:**

> **23.   <u>SUBROGATION</u>**
> **If the Company pays a claim under this policy, it will**
> **be subrogated to the extent of such payment, to all the**
> **Insured's rights of recovery from other persons,**
> **organizations and entities.**
> **                    * * * * ***
> **The Insured will act in concert with the Company and**
> **all other interests concerned, in the exercise of such**
> **rights of recovery.**
>
> **If any amount is recovered as a result of such**
> **proceedings, the net amount recovered after deducting**
> **the cost of recovery will accrue first to the**
> **Company(ies) involved in proportion to their respective**
> **interests.  If there is no recovery, the interests**
> **instituting the proceedings will bear the expense of**
> **the proceedings proportionately.**
>
> **The Insured will do nothing after the loss to prejudice**
> **such rights of subrogation.**

3.    This is a duplicate of fact number 7 above.

4.    This is a duplicate of fact number 7 above.

5.    This is a duplicate of fact number 7 above.

6.    This is a duplicate of fact number 11 above.

7.    This is a duplicate of fact number 12 above.

**8.    The excess policy insured against direct loss or damage**

**and actual loss, as per the coverage terms of the primary policy.**

9.    This is a duplicate of fact number 13 above.

24

10. As contracted between Travelers and KCP&L, Travelers receives priority of recovery of any subrogation recovery by KCP&L to the extent Travelers has made payment to KCP&L under the excess policy.

Travelers cites to the paragraph quoted in fact number 13 above which is found in the insurance contract in support of this proposed fact. This proposed fact is merely Travelers's interpretation of the legal effect of paragraph 11.A. of the contract. This is not a fact, it is a legal conclusion.

11. This is a duplicate of fact number 1 above.

12. This is a duplicate of fact number 40 above.

13. This is a duplicate of fact numbers 15-19 above.

14. This is a duplicate of fact number 21 above.

**15. Under the allocation agreement, the prosecution of the subrogation claims was managed by the primary insurers.**

**16. At the time the allocation agreement was executed by the primary insurers and KCP&L in June 2000, the primary layer of insurance had not been exhausted, and Travelers had not made any payments under the Travelers excess policy to KCP&L.**

**17. Based on information provided to them from their adjuster and otherwise, Travelers believes that the total amount of insured damages would not exceed $200 million.**

The original proposed fact included the primary insurers along with Travelers in holding the belief that the damages would not exceed $200 million.

In support of this proposed fact, Travelers cites to deposition testimony of Gary Morrow. Although neither party thought it important to include the portion of Morrow's testimony indicating who he is, I have concluded by KCP&L's proposed fact number 14 that Morrow is an employee of KCP&L. Travelers has provided no admissible basis for Morrow, an employee of KCP&L, knowing the belief of Travelers or the primary insurers.

Travelers also points to an October 13, 2000, letter from Bill Schoenborn to KCP&L (attention Gary Morrow) indicating that Roe Vaughn said the damages would not likely exceed $200 million. KCP&L does not contest this portion of the proposed fact; although I must admit to some confusion at this point since there have been citations to evidence produced by Bill Schoenborn indicating that it is likely the damages will exceed $200 million.

18. This is a duplicate of fact numbers 21 and 22 above.

19. This is a duplicate of fact number 25 above.

**20. Travelers reserved its rights to participate in the allocation agreement in the event Travelers made payment under its excess policy.**

26

KCP&L disputes this proposed fact without citing to any evidence. KCP&L argues that this is a legal conclusion and not a fact. However, in the letter written by Bill Schoenborn to Gary Morrow on October 13, 2000, Mr. Schoenborn wrote, "While the adjustment to date indicates the loss is not likely to exceed $200 million, Travelers reserves its rights to participate in the subrogation agreement if the situation changes." The letter refers to the allocation agreement as a "subrogation agreement". This fact does not establish that Travelers actually has any rights to participate in the agreement, it merely states that Travelers reserves any rights that may exist.

21. Roe Vaughn had been retained as an independent adjuster on behalf of the insurers and issued reports from February 22, 1999, through August 13, 2003, that estimated that the net claim would not exceed $200 million.

In support of this proposed fact, Travelers cites to an exhibit which is literally hundreds of pages long (the exhibit is a stack of paper an inch thick), without pointing to any particular page or paragraph. I decline to search through these documents to see if Travelers's proposed fact is supported. Further, I note that proposed fact 4 above states that Roe Vaughn, in those same reports, said there was a "strong possibility that the quantum of loss may breach the next layer of $200,000,000.00", which Travelers did not contest. No one has

27

bothered to explain the significance of the term "quantum" versus the term "net" in respect to loss.  The parties merely point to these hundreds and hundreds of pages in support of each position, with the "quantum loss" exceeding $200 million according to Mr. Vaughn and the "net loss" not exceeding $200 million according to Mr. Vaughn.

    22.  This is a duplicate of fact number 30 above.

    23.  This is a duplicate of fact number 30 above.

    24.  This is a duplicate of fact number 31 above.

    25.  This is a duplicate of fact number 41 above.

**26.  On August 6, 2002, Chad Neuens, an attorney with Neuens and Associates, wrote a letter to William Riggins of Great Plains Energy (the holding company of KCP&L) and Randall Hendricks, a lawyer with Rouse, Hendricks, German, May, stating as follows:**

> **To the extent that any money is recovered from the defendants in the captioned action [KCP&L v. Bibb & Associates, et al.], Travelers intends to take the position that these recoveries will be netted against any payments that Travelers may ultimately be responsible for on this claim.**

KCP&L objected to the spin placed on this proposed fact as originally written, arguing that it was a legal conclusion. Because the proposed fact as originally written was somewhat different from what Mr. Neuens said in his letter, I have changed the fact to quote from the letter.

    27.  This is a duplicate of fact number 42 above.

**28.  On June 15, 2004, after Travelers and KCP&L had briefed whether KCP&L was entitled to allocate subrogation recoveries as insured or uninsured losses with regard to reduction of KCP&L's ultimate net loss, the federal court declined to address any issue pertaining to subrogation as "[a]rguments applying the principles of subrogation have no place in the interpretation of thee excess policy's 'ultimate net loss' clause."**

29.  This is a duplicate of fact number 48 above.

30.  This is a duplicate of fact number 34 above.

**31.  On June 14, 2006, Travelers demanded reimbursement from KCP&L under the subrogation clause from the Rockwell judgment.**

**32.  On September 7, 2006, KCP&L received $115,204,305.05 from Rockwell.**

The citations to the record by Travelers do not support this fact.  The judgment indicates judgment was entered, but the bank statement is not self-explanatory, does not include the name Rockwell, and does not include any amount of $115,204,305.05. However, KCP&L does not contest this proposed fact.

33.  This is a duplicate of fact number 51 above.

34.  In the settlement agreement with Travelers, KCP&L agreed not to assert certain affirmative defenses, including any based on statute of limitations or laches, relating to the parties' disagreement over subrogation rights.

KCP&L correctly points out that the settlement agreement cited by Travelers states that the agreement was not to assert these defenses "arising from or relating to either party's decision to defer resolution of this dispute".  Travelers's citation does not support the proposed fact which appears to be its interpretation of this portion of the settlement agreement.

**35.  In the answer to Travelers's first amended complaint, KCP&L asserted certain affirmative defenses, including statute of limitations and laches.**

36.  This is a duplicate of fact number 50 above.

**37.  KCP&L, the insured, has not reimbursed Travelers for any of the $10 million that Travelers paid.**

38.  This is a duplicate of fact number 35 above.

**39.  National Union, the primary carrier, has not reimbursed Travelers for any of the $10 million that Travelers paid to KCP&L.**

40.  Travelers requests leave to present evidence of fees and expenses upon the granting of its motion for summary judgment.

This is not a proposed fact, it is a request.

*IV.  SUMMARY OF UNDISPUTED FACTS*

In order to make the undisputed facts easier to use, I have condensed them and will repeat below the undisputed facts essential to my analysis.

30

On February 17, 1999, a natural gas explosion occurred at KCP&L's Hawthorn Generating Station, Kansas City, Missouri. As a result of the explosion, KCP&L suffered damages totaling $452 million. KCP&L has not been fully compensated for the insured and uninsured losses it suffered from the explosion -- it has received less than $452 million in insurance, settlement, and judgment proceeds.

Defendant National Union issued a primary insurance policy, Policy No. ST 260 44 57, policy period 03/31/1997 through 03/31/2000, to KCP&L. Pursuant to the primary policy, Reliance insured $25 million of the first $100 million in damages, while National Union insured $75 million of the first $100 million worth of damages and $100 million of the second $100 million of the primary layer of insurance. Thus the primary policy, which National Union and Reliance issued to KCP&L, had limits of $200 million.

Travelers issued an excess policy, Policy No. KTXJ-CMB201T279-9-98, policy period 03/31/1998 through 03/31/1999, to KCP&L. The excess policy provides that Travelers "insures against risks of direct physical loss or damage to Buildings, Structures and Personal Property." Under the excess policy issued to KCP&L, Travelers was liable for loss in excess of the $200 million insured by National Union and Reliance through the primary policy, with limits of $100 million.

In a letter dated September 27, 1999, Gary Morrow, Risk
Manager for KCP&L, told representatives of National Union,
Reliance, and Travelers that "KCP&L has an independent right of
recovery against possibly the same set of potential responsible
parties, to the extent that we have a loss that is uncompensated
under the insurance contracts."  Morrow invited the insurers,
including Travelers, to meet to discuss jointly pursuing claims
against third parties.  Morrow stated that KCP&L wanted to
establish an agreement with each insurer to determine how costs
and recoveries would be apportioned.

On November 5, 1999, Roe Vaughn (Executive General Adjuster)
faxed a communication to representatives of the insurers,
including Bill Schoenborn for Travelers, confirming that a
subrogation meeting had been scheduled for November 15, 1999, and
noting that a discussion between the insurers and KCP&L regarding
the allocation of subrogation recovery funds and expenses was
expected at the meeting.

On November 11, 1999, Bill Schoenborn for Travelers, sent an
e-mail to Charles P. Nicholas and John P. Condon, both at
Travelers, in which he discussed the KCP&L loss and stated that
"the possibility certainly exists that it will reach $200M."
Schoenborn told the recipients about the November 15, 1999,
subrogation meeting and stated that "[i]t is also expected that
the carriers and KCP&L will be discussing sharing of any

32

recoveries. The potential for recovery does exist according to Roe Vaughn." Schoenborn further stated that "attendance by a subrogation representative would be in our best interests." Although Travelers was aware of the meeting held on November 15, 1999, no representative from Travelers attended.

KCP&L proposed that National Union, Reliance, KCP&L, and Travelers enter into an Allocation Agreement to cooperate in the prosecution of claims and/or actions against third parties responsible for the explosion. KCP&L further suggested that pursuant to a proposed agreement, National Union, Reliance, Travelers, and KCP&L would share the costs associated with recovery from responsible third parties, and then allocate the recovery among National Union, Reliance, Travelers, and KCP&L.

National Union and KCP&L entered into the allocation agreement dated June 29, 2000. The allocation agreement provided:

> WHEREAS, on February 17, 1999, an explosion occurred at KCPL's Hawthorn Unit 5 ("Hawthorn") which resulted in loss and damage (hereinafter "Loss" or "Losses") to KCPL;

> WHEREAS, a portion of the Loss was covered under the Policies;

> WHEREAS, a portion of the Loss was not covered under the Policies;

> WHEREAS, the Insurers claim to be subrogated to the rights of KCPL against any third party who may have caused the Loss, to the extent of their payments;

> WHEREAS, KCPL claims the right to pursue recovery of those Losses;

33

WHEREAS, the Insurers and KCPL agree that it would be in their mutual best interests to cooperate in the prosecution of any claim and/or action against any third parties ("Target Defendants") that they believe to be responsible for the Loss ("Recovery Action"); and

WHEREAS, the Insurers and KCPL have reached an agreement regarding the management of the Recovery Action, the sharing of costs associated with the Recovery Action and the allocation of any recovery therefrom.

On September 19, 2000, Gary Morrow (KCP&L's risk management consultant) met with Bill Schoenborn (executive general adjuster for Travelers) and proposed that Travelers join in a subrogation agreement with KCP&L and the primary insurers.

As a follow-up to the September 19, 2000, meeting between Bill Schoenborn and Garry Morrow, Bill Schoenborn drafted a letter to Gary Morrow dated September 20, 2000, reiterating that Travelers was not going to participate in the recovery efforts from responsible third parties because it did not expect KCP&L's insured damages to exceed the $200 million primary policy limits. In a September 21, 2000, e-mail from Bill Schoenborn to his superiors at Travelers, Schoenborn stated that he had reached an agreement with the carriers and Vaughn that "it would not be appropriate for Travelers to participate in the subrogation agreement, as it might send an incorrect message that [Travelers] expects the loss to exceed $200M."

In a letter dated October 13, 2000, Bill Schoenborn informed KCP&L that Travelers "declines to participate in the subrogation agreement at this time." Schoenborn further stated, "Based on

34

the present status of the loss adjustment, Travelers does not anticipate making payments which would give risk to a subrogation interest in this matter. For this reason, we do not believe it is appropriate for us to participate in the subrogation agreement at this time."

In 2001 KCP&L, acting in concert with National Union, filed suit against numerous third parties responsible for the Hawthorn generating station explosion in Jackson County, Missouri, styled Kansas City Power & Light Company v. Bibb & Associates, Inc., et al., No. 01CV207987 (the "Bibb" case). Prior to the trial, KCP&L received $126,592,696.12 in settlement proceeds ("settlement proceeds") from several responsible third parties. Pursuant to the allocation agreement, National Union received 55% (approximately $70 million) of the settlement proceeds, while KCP&L received 45% (approximately $56 million) of the settlement proceeds. At the conclusion of the Bibb trial, with Rockwell Automation as the only remaining defendant, the jury found that KCP&L sustained $452 million in total damages.

Meanwhile, on August 6, 2002, Chad Neuens, an attorney with Neuens and Associates, wrote a letter to William Riggins of Great Plains Energy (the holding company of KCP&L) and Randall Hendricks, a lawyer with Rouse, Hendricks, German, May, stating as follows:

> To the extent that any money is recovered from the
> defendants in the captioned action [KCP&L v. Bibb &

35

Associates, et al.], Travelers intends to take the position that these recoveries will be netted against any payments that Travelers may ultimately be responsible for on this claim.

On May 26, 2004, the state trial court entered a judgment against defendant Rockwell ("Rockwell judgment") in the amount of $97,622,191.16 (30% of the total judgment in accordance with the jury's finding that KCP&L was 70% at fault). The Honorable Judge Williamson reduced the judgment to $190,000.00. On September 5, 2006, in accordance with a Mandate issued by the Missouri Court of Appeals for the Western District, Judge Williamson reinstated the judgment in the amount of $97,022,191.16. Pursuant to the allocation agreement, National Union received 55% (approximately $53.3 million) of the Rockwell judgment proceeds, while KCP&L received 45% (approximately $43.7 million) of the judgment proceeds, plus interest.

KCP&L and National Union bore all the litigation risks, including attorneys' fees and expenses incurred, in bringing claims against third parties responsible for the Hawthorn generating station explosion.

On June 13, 2002, KCP&L made a claim to National Union and Reliance under the primary policy for $200 million and under the excess policy to Travelers for $85,870,731.00. KCP&L initiated a lawsuit against National Union and Travelers in the United States District Court for the Western District of Missouri, case no. 02-

36

0680-CV-W-DW, to recover proceeds pursuant to the primary and excess policies.

In May 2004 National Union and KCP&L reached a settlement agreement in which National Union agreed to pay $30,809,967 to resolve the claims, thereby exhausting the $200 million primary policy limits of liability.

On July 29, 2004, the court ordered the parties to brief the following issues:

> a.  Whether KCP&L or Travelers was entitled to declare that monies already received by KCP&L represent its uninsured loss or insured loss.
>
> b.  Whether the court or a jury should determine how much of the monies already received by KCP&L represent its uninsured loss or insured loss.

On August 26, 2004, KCP&L filed a response brief pursuant to the July 29, 2004, order.  In an affidavit attached to the brief, Bob Gingrich, then corporate counsel for KCP&L, stated that "KCPL's intent in executing the Allocation Agreement with National Union Fire Insurance Company and Reliance National Insurance Company was to recover its uninsured losses in the recovery action."  In the affidavit, Mr. Gingrich recited trial testimony of KCP&L's expert witness, Karl A. McDermott, in which Mr. McDermott testified that KCP&L's loss of use damages (i.e., uninsured loss), which included fuel costs of $34 million, replacement power costs of $116 million, lost sales profits of

37

$26 million, and an operating & maintenance savings of $29 million, totaled $147 million.

On September 10, 2004, the court issued an order in which it held that "KCPL is entitled to allocate the amount that it has recovered from third parties [i.e., the settlement proceeds] as insured or uninsured loss." The court further concluded:

> The Allocation Agreement entered into by KCPL and National Union contemplates a recovery of both the insured and uninsured losses suffered by the plaintiffs. Travelers Brief at Ex. D (Allocation Agreement). Because the suit prosecuted by KCPL and National Union was intended to recover both insured and uninsured losses, it is reasonable to surmise that the amount recovered by National Union -- the primary insurer -- represents the insured loss, while the amount recovered by KCPL is attributable to its uninsured loss. See also KCPL Brief at Ex. 1 (Affidavit of Bob Gingrich) ("KCPL's intent in executing the Allocation Agreement . . . was to recover its uninsured losses in the recovery action.) In any event, given the case law on the subject, it is KCPL's prerogative to declare how much of the monies it has recovered from third parties should be allocated to its uninsured loss. It has done so in this case.

In January 2005 Travelers and KCP&L reached a settlement agreement in which Travelers agreed to pay $10 million to resolve KCP&L's excess policy insurance claim.

On June 14, 2006, Travelers demanded reimbursement from KCP&L under the subrogation clause from the Rockwell judgment.

On July 21, 2006, Travelers filed its first amended complaint in this matter, adding KCP&L as a defendant. Travelers asserted one claim against KCP&L (count 4) seeking a declaratory judgment on the following issues:

38

(1) Travelers has a superior interest in any monies
recovered through subrogation, and no party is entitled to
reimbursement of subrogation monies prior to Travelers; (2)
Travelers is entitled to reimbursement of the $10 million it
paid to KCPL from amounts KCPL recovers from Rockwell
Automation, Inc., plus interest; (3) to award Travelers its
expenses, costs, and attorney's fees incurred; and (4) and
[sic] for such other and further relief as this Honorable
Court deems just and appropriate.

## V.    *INSURED VERSUS UNINSURED LOSSES*

KCP&L argues that the funds at issue here represent
uninsured losses, that Travelers is estopped from asserting that
KCP&L's recoveries were for insured losses, and the insurance
contract does not require KCP&L to reimburse Travelers funds
recovered for uninsured loss.  Travelers argues that it makes no
difference whether the funds recovered by KCP&L are for insured
or uninsured losses because KCP&L has a duty to hold "subrogation
proceeds" for Travelers.  This argument assumes the proceeds were
"subrogation proceeds" which begs the question.  Furthermore, it
is illogical to call proceeds for uninsured damages subrogation
proceeds since subrogation means to substitute one party for
another with reference to a claim or right.  Travelers would have
no right to be substituted with regard to uninsured damages.  I
find that it does make a difference whether the money recovered
is for insured or insured damages.

The state lawsuit which resulted in the proceeds at issue in
this case was brought by KCP&L and sought "judgment against each
defendant, jointly and severally, **in the full and complete amount**

**of KCPL's damages**, as determined by a jury and **now in excess of $450 million**." (emphasis added). The jury found that KCP&L's total damages were $452 million. Only $300 million in damages were covered by insurance, leaving $152 million in damages representing uninsured damages.

KCP&L recovered $126,592,696.12 in settlement proceeds, 55% of which went to National Union pursuant to their allocation agreement, leaving KCP&L with approximately $56,966,713.25. KCP&L received an additional $97,622,191.16 from the jury verdict (with approximately $53,692,205 going to National Union pursuant to the allocation agreement and approximately $43,929,986 remaining with KCP&L), meaning KCP&L has received approximately $100,896,699 from third-party tortfeasors. This is far short of the $152,000,000 in uninsured damages suffered by KCP&L.

KCP&L offers no case law in support of its position that it is entitled to keep the proceeds at issue as uninsured losses. Travelers offers cases that are not on point, Farmers Insurance Company, Inc. v. Effertz, 795 S.W.2d 424 (Mo. App. 1990), and Hagar v. Wright Tire & Appliance, Inc., 33 S.W.3d 605 (Mo. App. 2000). In addition, Travelers cites Keisker v. Farmer, 90 S.W.3d 71 (Mo. banc 2002); however, Travelers's analysis of that case is erroneous.

In Farmers v. Effertz, Spindle passed a truck driven by Effertz and crashed into Davis. Farmers insured Davis and paid

him for the damage to his vehicle.  Davis sued Spindle and

Effertz for personal injuries and won.  Farmers then sued Effertz

for the amount it now owed Davis for property damage.  The trial

judge granted summary judgment in favor of Farmers finding Davis

had assigned his rights to Farmers.  The court of appeals

reversed, holding that there had been no assignment.

> The firmly established rule in Missouri . . . is when an
> insurer pays a property loss, then its right to maintain
> suit against the tort-feasor depends upon whether it
> receives from the insured an assignment of the whole claim
> as compared with merely rights of subrogation.  If the
> insurer receives such an assignment, then it has the
> exclusive right to maintain the suit against the tort-feasor
> for the entire claim including any deductible item.  On the
> other hand, if the insurer's rights are simply those of
> subrogation, then legal title remains in the insured and he
> retains the exclusive right to bring the suit.  An
> assignment . . . divests the assignor of all interest in the
> thing assigned, and vests the same in the assignee.
> Subrogation . . . arises by operation of law (in the
> casualty insurance context) when the insurance company under
> its contract obligation pays all or a part of the property
> damage incurred by its insured.  The legal title to the
> cause of action remains in the insured.  The exclusive right
> to sue for the entire loss remains with the insured, though
> he will hold the proceeds for the insurer.

795 S.W.2d at 426 (internal citation omitted).

This case answered one question -- whether the insurance

company was permitted by law to bring a suit against the third-

party tortfeasor in its own name.  The answer was "no".  Effertz

does not answer the question of who gets the money when the

insured recovers less than the uninsured damages.

Likewise the Hagar case is inapplicable to the facts of this

case.  In Hagar, Shelter Insurance paid the Hagars for property

41

damage after an explosion, and the Hagars sued Wright Tire, the third-party tortfeasor, for personal injury and property damage. While that suit was pending, Shelter asked Wright Tire's insurer for reimbursement. The insurer reimbursed Shelter and then, when the underlying suit was resolved, it requested a credit on the judgment for the amount it had paid to Shelter. Wright Tire's insurer was not allowed a credit: "Shelter . . . had no right to try to settle that claim behind the backs of the Hagars, and without their consent, as occurred here. . . . The burdens caused by Wright Tire's insurer's decision to settle a claim brought by Shelter which Shelter had no right to bring should remain on that insurer." There simply is no similarity between what occurred in the Hagar case and what happened in the case at bar. The issue here is not whether Travelers was allowed to settle a claim with the insurance company of any third-party tortfeasor. The issue is who is entitled to the money recovered by KCP&L directly from the tortfeasors.

Travelers argues that the Missouri Supreme Court, in Keisker v. Farmer, 90 S.W.3d 71 (Mo. banc 2002), held that the insurer had a right of subrogation to the extent of the insurer's payment and that the exclusive right to pursue the tortfeasor remained with the insured who "holds the proceeds for the insurer." Although that is part of the holding in the Keisker case, it is the dicta in that case that is important for our purposes.

42

In <u>Keisker</u>, Trinity Insurance insured the Sandwich Shop for
$125,000 on the building, $50,000 on personal property, and
$15,000 for business-income loss.  After two cars ran into the
shop (including one driven by a police officer), Trinity paid the
Shop $127,109 for the building and personal property and $15,000
for the lost income.  The Shop then sued the police officer, the
other driver, and the city for loss of income and profits, not
for any damage to the building or personal property.  The Shop
collected $6,000 from the second driver, and the city deposited
$100,000 into the court's registry and counterclaimed for
interpleader.  Trinity moved to intervene, claiming the entire
$100,000 for the amounts it paid to the Shop for the building,
personal property, and lost income.  The Missouri Supreme Court
first found that there had been no assignment of claims,
explaining that:

> [a]ssignment of a claim differs from subrogation to a claim.
> In assignment, the assignor gives all rights to the
> assignee.  By an assignment, the insurer receives legal
> title to the claim, and the exclusive right to pursue the
> tortfeasor.  In subrogation, the insured retains legal title
> to the claim.  By paying the insured, the insurer has a
> right to subrogation.  The exclusive right to pursue the
> tortfeasor remains with the insured, which holds the
> proceeds for the insurer.

90 S.W.3d at 74.

Travelers's argument is taken from this quoted paragraph.
However, the Court went on:  "Subrogation exists to prevent
unjust enrichment. . . .  The shop concedes that it would be

43

unjustly enriched if it recovered its first $15,000 in lost profits from both Trinity and the City. In addition to the $15,000 from Trinity, the Shop received $6,000 from the second driver -- for a total of $21,000. <u>Assuming the Shop can prove lost profits of at least $106,000 [the $6,000 recovered from the second driver and the $100,000 from the City], the Shop is not unjustly enriched in receiving the remaining $85,000 of the interpled funds.</u>" <u>Id</u>. at 75 (emphasis added).

This is contrary to the argument presented by Travelers. The Missouri Supreme Court stated in dicta that the Shop was entitled to keep all of the money it received in its lawsuit against the tortfeasors (all of which was for lost profits) to the extent it was not unjustly enriched -- in other words, to the extent of its <u>uninsured damages</u>. These uninsured damages would be lost profits exceeding the $15,000 for which lost profits had been insured. Travelers argues that the Court awarded the first $15,000 to the insurance company; however, that is not what happened. The insured did not contest the first $15,000 and admitted it would be unjustly enriched were it not to reimburse the insurance company for that $15,000 it had paid to the insured for lost profits. Since that was not at issue, there was no holding by the Court that the insurer receive its reimbursement before the rest of the money is distributed. In fact, there was

not even a discussion of this issue by the court since it was not
an issue in that case.

The Keisker case is in accord with another case with similar
circumstances, Federal Savings & Loan Insurance Corp. v.
Insurance Company of North America, 1989 WL 39031 (D.D.C. April
13, 1989). In that case, the insured filed suit against the
insurer for failure to pay under an insurance policy providing
coverage for losses due to employee dishonesty. After the
insured suffered a loss caused by the improper diversion of
funds, it filed a separate action against the responsible parties
and settled the case for over $1 million. The insurer moved for
summary judgment, arguing that it should not be liable for any
amount because the insured already recovered over $1 million and
the insurance policy provided only $1 million in coverage. In
rejecting this argument, the court stated:

> When an insured obtains a recovery in a situation like this
> . . . the insured is entitled to allocate the funds
> recovered to offset, first, the reasonable cost of obtaining
> the recovery[5] and, second, the losses caused by the persons
> against whom the recovery was obtained that were not covered
> by the insurance agreement, i.e., losses in excess of the
> coverage amount. Only if the amount recovered exceeds the
> reasonable cost of obtaining the recovery and the amount of
> uninsured loss can an insurer claim that a portion of the

---

[5]KCP&L has not offered an undisputed fact regarding its cost
of recovering the $100 million in the state court proceedings;
however, in footnote 2 of exhibit 32 (a brief filed in the first
federal case, document number 158), KCP&L represents that the
costs and fees exceeded $19.3 million. That allegation is
supported by an attached affidavit of Bob Gingrich, corporate
counsel for Great Plains Energy (the holding company of KCP&L).

45

recovery should be allocated to offset the insurer's liability under the insurance agreement.

<u>Id</u>. at *1.

"In interpreting state law, we are bound by the decisions of the state's highest court." <u>Minn. Supply Co. v. Raymond Corp.</u>, 472 F.3d 524, 534 (8th Cir. 2006) (internal quotation omitted). "When a state's highest court has not decided an issue, it is up to this court to predict how the state's highest court would resolve that issue." <u>Id</u>. "Decisions of intermediate state appellate courts are persuasive authority that we follow when they are the best evidence of what state law is." <u>Id</u>. See <u>also</u> <u>Allstate v. Blount</u>, 491 F.3d at 908.

I have been unable to find another relevant case on this issue in Missouri. However, because of the following, I find that the Missouri Supreme Court, if faced with the issue presented here, would hold in accordance with the dicta in <u>Keisker</u>, that is, that an insured is permitted to keep proceeds from third party tortfeasors to the extent those proceeds represent uninsured damages: (1) the <u>Federal Savings & Loan</u> case reaches a conclusion identical to the dicta in <u>Keisker</u>; (2) the dicta serves the purpose of subrogation enunciated in <u>Keisker</u>, i.e., to prevent unjust enrichment; and (3) public policy supports a holding that the insurer, who has been paid to assume a risk, be made to bear that risk until the insured has recovered its uninsured damages.

46

In this case, Travelers does not argue that KCP&L assigned its rights to Travelers.  Travelers acknowledges that KCP&L was entitled to sue the third-party tortfeasors.  In its lawsuit against the third parties, KCP&L sought recovery of all of its damages, insured and uninsured.  KCP&L recovered less than its uninsured damages.  Subrogation exists to prevent unjust enrichment; however, because KCP&L recovered less than its uninsured damages, it has not been unjustly enriched as it has not been compensated twice for any damages.  Therefore, Travelers is not entitled to any part of the proceeds recovered by KCP&L in the state actions -- settlement proceeds or proceeds awarded by a jury[6].

## VI.  CONCLUSION

Because the money obtained by KCP&L in the state court action constituted recovery for uninsured damages, and because KCP&L has not been compensated twice for any insured damages,

---

[6]I note here also that were Travelers entitled to any of the proceeds of KCP&L's efforts to recover from the third parties, Travelers would be required to kick in its share of litigation expenses.  "Trinity's subrogation recovery must be reduced by its share of litigation expenses.  Where one litigates to create a fund for others, those sharing must contribute a proportional part of the expenses.  Trinity -- by a deduction from its recovery -- must pay its share of litigation expenses in the proportion that its recovery bears to the total cash recovery by both Trinity and the Shop."  Keisker v. Farmer, 90 S.W.3d at 75. Although it is not included as an undisputed fact, the documents allege that KCP&L spent $19.3 million collecting damages from the third-parties.  It is unknown how much National Union spent in collecting the damages from the third parties.

47

Travelers is not entitled to any of the money at issue in this case.  Therefore, it is

ORDERED that Kansas City Power & Light's motion for summary judgment on count four of the complaint is granted.


_____/s/ Robert E. Larsen_____
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
July 24, 2008